MEDLIN v. COMMONWEALTH BONDING & CASUALTY INS. CO.*
(No. 484.)

(Court of Civil Appeals of Texas. Amarillo. Feb. 7, 1914. Supplemental Opinion April 4, 1915.)

1. JUDGMENT ⬟⟿427—SUIT TO SET ASIDE— GROUNDS FOR RELIEF.

That the judgment defendant failed to appear and present a meritorious defense in reliance on an oral agreement between the attorneys that the case should be postponed, and the court adjourned without any opportunity being afforded to file a motion to set aside the judgment at that term, was grounds for equitable relief, even though the trial court could not have been required to enforce an oral agreement for postponement, especially where an agreement to change the venue, dependent on the agreement for a postponement, was reduced to writing and duly signed and forwarded to the clerk, but not received by him until after the court adjourned.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 805–807; Dec. Dig. ⬟⟿427.]

2. CORPORATIONS ⬟⟿80 — STOCK SUBSCRIPTION — REPRESENTATIONS — SUFFICIENCY OF EVIDENCE.

Evidence, in a suit to set aside a judgment canceling a note and deed of trust given as part of a stock subscription, held to show that the subscription was not procured by representations that the proposed corporation would loan the subscriber $50,000, or that the purpose of its organization was to make such loans.

[Ed. Note.—For other cases, see Corporations. Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec. Dig. ⬟⟿80.]

3. CORPORATIONS ⬟⟿83—STOCK SUBSCRIPTION—AVOIDANCE OF LIABILITY—GROUNDS.

A subscriber to the stock of a corporation to be organized under the laws of Texas, with a certain amount of paid-up capital stock, may avoid his liability on the subscription contract, where the company is incorporated under the laws of Arizona with a less paid-up capital than that agreed upon, unless he has waived, or by his conduct estopped himself from relying on, such conditions of his subscription contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 328–336; Dec. Dig. ⬟⟿83.]

4. CORPORATIONS ⬟⟿81 — STOCK SUBSCRIPTION CONTRACT—WAIVER OF CONDITIONS.

Where a subscriber to the stock of a corporation to be organized under the laws of Texas, with a paid-up capital stock of $200,000, on being notified of a stockholders' meeting to be held to determine under what state law the corporation should be organized, appointed a representative, who acted for him at the meeting, at which it was determined to incorporate under the laws of Arizona with less than $200,000 of paid-up capital stock, and thereafter accepted an agreement by the new corporation as chartered under the laws of Arizona to underwrite real estate loans to be made by him, he waived the conditions of his subscription contract as to the law under which the corporation should be organized and the amount of paid-up capital stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 266–284; Dec. Dig. ⬟⟿81.]

5. CORPORATIONS ⬟⟿29—LEGALITY OF INCORPORATION—COLLATERAL ATTACK BY STOCKHOLDER.

A corporation cannot be attacked collaterally by a stockholder upon call for payment of stock subscriptions.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 77–79, 2504; Dec. Dig. ⬟⟿29.]

6. CORPORATIONS ⬟⟿91—STOCK SUBSCRIPTION—NOTE AND DEED OF TRUST—VALIDITY.

A note and deed of trust, given as part of a subscription to the stock of a corporation to be organized and to secure its payment on call, were not void on the ground that they were given in payment of stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 365, 366; Dec. Dig. ⬟⟿91.]

Appeal from District Court, Hemphill County; B. M. Baker, Special Judge.

Suit by the Commonwealth Bonding & Casualty Insurance Company against L. L. Medlin. From judgment for plaintiff, defendant appeals. Affirmed.

Jas. A. Stephens, of Benjamin, H. E. Hoover, of Canadian, and J. T. Montgomery, of Wichita Falls, for appellant. Capps, Cantey, Hanger & Short, and Stephens & Miller, all of Ft. Worth, and Cooper, Merrill & Lumpkin, of Houston, for appellee.

HUFF, C. J. This suit was instituted originally in the district court of Hansford county, Tex., by the appellee, Commonwealth Bonding & Casualty Insurance Company, against the appellant, L. L. Medlin, to set aside a judgment rendered in the district court of Hansford county, on the 16th day of April, 1912, in the case of L. L. Medlin against the Commonwealth Bonding & Casualty Insurance Company, numbered on the docket 112. By agreement of all parties the venue was changed from Hansford county to Hemphill county, and a judgment rendered in that court on the 28th day of January, 1913, canceling and setting aside the judgment obtained by appellant in cause No. 112. The appellee, in his petition to set aside and cancel the judgment, set up in effect that the judgment was obtained through fraud on the part of appellant, in that, prior to April 16, 1912, which was appearance day of the district court of Hansford county, appellant, acting by and through his attorney, L. W. Dalton, and the appellee entered into an agreement and understanding, by the terms of which it was agreed that said cause would be passed until the 18th or 19th day of April, 1912. Appellant disregarded said agreement, and, without notice to appellee, after he had acknowledged that said agreement was made, procured the court to overrule the appellee's plea of privilege to be sued in Tarrant county, Tex., and thereupon took a judgment by default against appellee for the sum of $645,

and canceled the note for $4,375, as well as a deed of trust given to secure the same, together with a certain contract of subscription for stock in the appellee company and the cancellation of certificate of stock in said company, and further setting up the fact that it had a meritorious defense to appellant's alleged cause of action, setting out in detail the defense thereto.

It will be impossible for us to set out the pleadings anything like in full, as they cover over 50 pages of the record in this case. A recitation of the facts will sufficiently designate the issues presented in the court below and in this court. The case was tried in the court below before the judge without the intervention of a jury, who rendered judgment for appellee, therein setting aside the former judgment, and he did not file findings of fact and conclusions of law, and the case is before us alone upon the statement of facts.

The appellant brought suit in the district court of Hansford county, in the spring of 1912, by which he sought to cancel a certain note for $4,375, a deed of trust, and to recover the sum of $645, paid, and to cancel the subscription contract and certain stock certificate, issued by said corporation for 125 shares, alleging a number of grounds for such cancellation, among others that one C. S. McDonald, acting for himself and as coconspirator with appellee company, made to the appellant false and fraudulent representations that all of the stock in the then proposed corporation had been sold and paid in; and that said company would be organized and in the business of loaning money and discounting the notes to stockholders within a short time; and that they had about $800,-000 ready to loan on application as soon as the charter was procured, and that plaintiff would be able to procure a loan of $50,000 from said corporation, said loan to be made upon interest at the rate of not to exceed 7 per cent. per annum; and that said company or corporation then had arrangements made by which they would have on hand money to make the loan of $25,000 to plaintiff—further alleging that he subscribed to the stock on the condition that it was to be a Texas corporation, and that its charter was to be obtained in Texas, under the laws of the state, but instead thereof that it was organized under the laws of the territory of Arizona, and for a different purpose than that which had been represented to him it would be organized, and that under its organization it was not authorized to loan money, etc.

The Hansford county district court convened on the 15th day of April, 1912, and on that day the appellee insurance company filed its plea of privilege to be sued in Tarrant county. On the 16th day, which was appearance day, appellee was not present in person or by any representative or attorney, and the appellant, Medlin, took judgment, the court finding against the plea of privilege filed by appellee and rendering judgment by default, canceling the note, deeds of trust, etc.

The petition of appellant in cause No. 112, was signed by James A. Stephens and L. W. Dalton, as attorneys for appellant, who were in fact the attorneys representing appellant in that cause. The facts warranted the court in finding that in the week previous to the convening of the district court of Hansford county, R. T. Stuart, vice president of appellee company, entered into an agreement with L. W. Dalton, to pass the case until Friday of the first week of court, some time, either the 18th or 19th of April. This agreement was effected by Stuart wiring Dalton that he desired to get in communication with him over the long-distance phone, and which resulted in Dalton and Stuart over the phone agreeing to pass the case until the 19th of April, in order that they might settle or compromise the case. Dalton made the agreement, provided his associate counsel, Jas. A. Stephens, would consent. He phoned Stephens of the proposed agreement to pass the case and the object for passing it, and Stephens said that it would be all right, and on receiving Stephens' assent, Dalton made the agreement to pass the case, and confirmed the agreement by letter to Stuart, dated April 13, 1912, in which it was stated substantially that the case would be passed until Friday, and that if the court should not last sufficient length of time, or for any reason they could not get a trial at that court, then the venue should be changed to Lipscomb county. It seems, also, that L. W. Dalton wrote a letter to Judge F. P. Greever, the presiding judge of the court, that they had entered into an agreement to postpone the case until April 19th, and that if the court should adjourn before the case could be tried, they agreed to change the venue to Lipscomb county. Judge Greever being unable to preside over the court, Judge W. D. Fisher was selected to preside during that term. Dalton, learning of that fact, wrote a letter to him on the 15th, stating that he had written to Greever about the case being postponed, but it appears this letter was received after judgment was taken, and after the court adjourned. The business for the term of the Hansford court was disposed of by the 16th of April, on appearance day, and, no other business appearing after the judgment was taken, the court adjourned. Mr. James A. Stephens was present at that court, and insisted upon taking the judgment. It also appears that an agreement was made, signed by Dalton, that the venue should be changed to Lipscomb county, but it did not reach the hands of the district clerk until after the adjournment of the court. The facts warranted the trial judge in finding that the agreement

between Dalton and the representatives of the appellee corporation were entered into in good faith and bona fide, and that appellee, relying on the agreement made with Dalton, did not, by representative or otherwise, appear on appearance day.

The facts upon which the appellee founded its defense against appellant's alleged cause of action are substantially that C. S. McDonald, acting as agent for Stuart, Harkrider & Co., sold to the appellee 125 shares in the proposed corporation, and obtained appellant Medlin's application to purchase said stock. McDonald substantially told Medlin that the corporation would be a Texas corporation. McDonald told Medlin that practically $1,000,000 of the stock had been sold, and that the company would be incorporated under the laws of Texas. The representations made by McDonald were that:

"The insurance company would, at its option, either handle or become the guarantors for purchasers of capital stock at least 10 times as much negotiable real estate securities as he had capital stock, at a rate of interest not to exceed 1 per cent. more than the money actually cost them; that is the statement I made to Mr. Medlin, and the contract, I understand, was delivered to Mr. Medlin to this effect."

The contract signed by Medlin is as follows:

"Commonwealth Bonding & Accident Insurance Co.

"Capital $10.00.                Surplus $30.00.

"Subscription to Capital Stock.

"No. 1475.                J—68.

"Whereas, the Commonwealth Organization Co. of Ft. Worth, Texas, are promoting the organization of the Casualty Bonding & Accident Insurance Company, to be incorporated in pursuance of the laws of the state of Texas, under the name of Commonwealth Bonding & Accident Insurance Company, or such other name as may be selected, with an authorized capital stock of $300,000.00, and paid-up capital of at least $200,000.00, paid up and free from organization expenses, all in accordance with the printed prospectus issued by them and delivered to me; and, whereas, by their acceptance of this subscription, said Commonwealth Organization Co. agree to endeavor with all reasonable diligence to accomplish on or before December 31, 1910, the organization of said corporation with capital stock fully paid as aforesaid, they to defray all expenses of the organization and incorporation: Now, therefore, I do hereby subscribe for 125 one-tenth shares of the par value of $10.00 each, of the capital stock of said Commonwealth Bonding & Accident Insurance Company and agree with the said company and the said Commonwealth Organization Company to pay therefor the sum of $5,000, as follows: The sum of $4,375.00 I agree to pay in money or securities satisfactory to the insurance department with six per cent. interest to said Commonwealth Bonding & Accident Insurance Company or its trustees at Ft. Worth, Texas (which goes to capital and surplus), at any time after November 1, 1910, immediately upon receipt of notice from said Commonwealth Organization Company that its capital stock has been subscribed in good faith in amounts and at rates netting the company at least $200,000, with capital in the aggregate when paid. The remaining sum of $625.00 I agree to pay and do pay concurrently with this subscription to the said Commonwealth Organization Company, in consideration of their agreement hereinbefore recited and in lieu of any further or other contribution to expense of organization incorporating said company. No conditions, representations or agreements other than those printed herein shall be binding on the Commonwealth Organization Company or the Commonwealth Bonding & Accident Insurance Company.

"Witness my hand this the 12th day of December, 1912.

"L. L. Medlin, Name of Subscriber.
"Witness:    C. S. McDonald."

The Commonwealth Organization Company appear to have delivered to subscribers for stock the following contract:

"Memorandum of agreement this day entered into by and between the Commonwealth Organization Company fiscal agents for the Commonwealth Bonding & Casualty Insurance Company of Ft. Worth, Texas, party of the first part, and ——— of ———, party of the second part witnesseth: That the party of the first part hereby agrees and guarantees to the party of the second part for the consideration of his subscription to the capital stock of the Commonwealth Bonding & Casualty Insurance Company, to the amount of $———, and for the full payment of said subscription agrees with the party of the second part to handle for him or become his guarantor at first party's election on negotiable real estate paper to the amount of at least ten times the amount of his subscription at the current rate of interest that can be secured at the time of the loan through Eastern or Western capital, with an additional one per cent. per annum for securing or guaranteeing such loan. Said paper to be secured by real estate to be worth at least double the amount of the loan, and subject to the approval of the finance committee. Said party of the first part agrees and guarantees to secure for the party of the second part a duplicate of this contract with the Commonwealth Bonding & Casualty Insurance Company within thirty days after the organization is in full force and effect. All expenses for securing said loan to be paid by the party of the second part. No statements or agreements other than printed in this contract shall be binding on the Commonwealth Organization Company or Commonwealth Bonding & Casualty Insurance Company.

"This contract is made in duplicate, etc.
"Commonwealth Organization Co.
"———."

The following agreement was introduced in evidence:

"Memorandum of agreement, this day entered into by and between the Commonwealth Bonding & Casualty Insurance Company, with offices at Ft. Worth, Texas, party of the first part, and L. L. Medlin, party of the second part, witnesseth: Whereas, party of the first part hereby agrees and guarantees to the party of the second part for and in consideration of $1.00 in hand paid, the receipt of which is hereby acknowledged, to handle for him or to become his guarantor at the first party's election, on negotiable real estate paper to the amount of $50,000, at the current rate of interest that can be secured through Eastern or Western capital, with an additional one per cent. per annum for securing or guaranteeing such loan; said papers to be secured by real estate to be worth at least double the amount of the loan and subject to the approval of the finance committee. All expenses for securing said loan to be paid by the party of the second part. This contract is made in duplicate.

"Witness our hands this the 27th day of June, 1911."

The following letter was introduced in evidence, dated, Ft. Worth, Tex., March 8, 1911:

"Mr. L. L. Medlin, Hansford, Texas—Dear Sir: The Commonwealth Bonding & Casualty Insurance Company is now ready to file its charter and enter the field for business and to facilitate the execution of bonds in transacting business, as well as to cover some other features of a general casualty business, it is necessary to have a by-law passed, authorizing the president or active vice ·president to appoint from time to time as the business of the company may demand, a resident vice president, resident assistant secretary and attorney in fact to represent and to act for and on behalf of the company. For this purpose and for the further purpose of deciding under what state laws this company shall incorporate a meeting of the stockholders is called by the president and executive committee to be held in the home office of the company in the Flat Iron Building at Ft. Worth, Texas, at ten o'clock a. m., on the 20th day of March, A. D. 1911. All stockholders are requested to be represented either in person or by proxy. Should it not be possible for you to be present, kindly sign one of the two forms of proxy which are inclosed herewith. One authorizes the name selected by the executive committee to act; the other is blank and can be filled in as you may elect.                    Morris H. Mills, Secretary."

The following proxy was introduced, signed by Mr. Medlin:

"State of Texas, County of Hansford.

"Know all men by these presents that I, L. L. Medlin, do hereby constitute and appoint John Scarborough, H. B. Branham, and M. H. Mills, jointly and severally, my attorneys and agents for me in my name, place and stead, to vote as my proxy at any annual or special meeting of the stockholders of the Commonwealth Bonding & Casualty Insurance Company, for the election of directors and upon such other questions as may come before such annual or special meeting to the number of votes I shall be entitled to if then personally present. This proxy can be revoked or canceled at any time by giving written notice.

"In witness whereof I have hereunto set my seal this the 15th day of March, 1911.

"[Signed] L. L. Medlin.

"Signed in presence of F. L. Kennedy."

On January 20, 1911, the following letter was written to L. L. Medlin:

"L. L. Medlin, Hansford, Texas—Dear Sir: We are now adjusting balance due from stockholders preparatory to filing our charter and as the necessary amount of stock has already been subscribed it is of the utmost importance that this matter receive prompt attention. By return mail kindly indicate just how you desire to secure the deferred payment on your subscription. It will be our desire to conform with your wishes as far as the requirements of the state department at Austin will permit. As you perhaps know, our list of stockholders includes a large number of bankers, and successful business men, which should enable us to file our charter and be ready for business at an early date—not later than February 1st, we hope.

"Yours truly,

"Commonwealth Bonding & Casualty Ins. Co.

"By M. H. Mills, Secretary."

The appellant introduced a certificate from B. L. Gill, commissioner of insurance and banking of the state of Texas, and the annual statement and affidavit as to the correctness of the same, of the Commonwealth Bonding & Casualty Insurance Company of Phœnix, Ariz., dated the 28th day of September, A. D. 1911:

Commonwealth Bonding & Casualty Insurance Company.

Organized under the laws of the territory of Arizona made to the commissioner of insurance and banking of the state of Texas, pursuant to the laws thereof.

Incorporated March 23, 1911, Commenced business ———.

Home Office ———————

(Street and number)

Phœnix, Ariz.

(City or town and state.)

General Offices, Ft. Worth, Texas.

Officers.

President, John Scharbauer; secretary, Morris H. Mills; vice-presidents, Coke W. Harkrider, R. T. Stuart; treasurer, H. P. Branham.

Directors: John Scharbauer, Morris H. Mills, H. P. Branham, Coke W. Harkrider, R. T. Stuart, W. B. Harrison, L. T. Lester, J. D. Hagler, C. H. Boedeker.

I. Capital Stock.

1. Amount of capital paid up in
cash .................... $300,000 00
Extended at............... $300,000 00

II. Income.

No business transacted.
Total ...................... $300,000 00

III. Disbursements.

Total disbursements.............
Balance ..................... $300,000 00

IV. Ledger Assets.

2. Mortgage loans on real estate, per Schedule B, First liens $113,975.00; other than first, $72,629.71........ $186,604 61
3. Loans secured by pledge of bonds, stocks or other collaterals, per Schedule C...... 49,005 00
4. Book value of bonds, $50,000.00 .................. 50,000 00
6. Deposits in trust companies and banks not on interest... 9,352 89
7. Deposits in trust companies and banks on interest....... 5,037 50

30. Ledger assets as per balance on page 3....................$300,000 00

Nonledger Assets.

41. Notes ......................$290,696 54

43. Gross Assets...............$590,696 64

V. Liabilities.

47. Capital actually paid up in cash ......................$300,000 00
48. Surplus over all liabilities....$390,696 64

50.    Total liabilities..........$590,696.54

State of Texas, County of Tarrant.

Coke W. Harkrider, vice president, M. H. Mills, secretary, of the Commonwealth Bonding & Casualty Insurance Company, being duly sworn, each for himself deposes and says that they are the above-described officers of the said company, and that on the thirty-first day of December last, all of the above-described assets were the absolute property of the said company, free and clear from any liens or claims thereon, except as above stated, and that the foregoing statements, with the schedules and explanations therein contained, annexed, or referred to, are a full and correct exhibit of all the assets, liabilities, income, and disbursements and of the condition and affairs of the said company on the said 31st day of December last and for the year ending on that date,

according to the best of their information, knowledge, and belief, respectively.

This company has in addition to capital stock shown in this statement, after paying all obligations, assets in the form of notes amounting to $290,696.64.

Coke W. Harkrider, President.
M. H. Mills, Secretary.

Subscribed and sworn to before me this the 26th day of May, 1911.

F. L. Kennedy,
Notary Public,
Tarrant County, Texas. [Seal.]

Certificate.    State of Texas, Department of Insurance and Banking.

I, B. L. Gill, commissioner of insurance and banking of the state of Texas, do hereby certify that the instrument which is hereto attached is a true, full, and correct copy of certificate of authority issued to the Commonwealth Bonding & Casualty Insurance Company of Phœnix, Ariz., now on file in and forming a part of the records of this department.

In testimony whereof I have hereunto subscribed my name officially, and have hereon impressed my seal of office at the city of Austin, in the state of Texas, on this 28th day of September, A. D. 1911.    B. L. Gill,
Commissioner of Insurance and Banking.
[Seal.]

Office of Commissioner of Insurance and Banking.

This is to certify that the Commonwealth Bonding & Casualty Insurance Company of Phœnix, Arizona, having complied with all requirements of law relating thereto, is hereby authorized to pursue the business of Surety, Fidelity, Liability, Guaranty, Plate Glass, Burglary, Theft, Steam Boiler, Accident and Casualty Insurance within this state for the year ending February 29, 1912.

In testimony whereof, I hereunto sign my name and affix my official seal, at Austin, Texas, this 13th day of June, 1911.

[Signed] B. L. Gill, Commissioner.

Article IX of the incorporation of the charter of appellee company is as follows:

Art. IX.—The largest amount of indebtedness for which the corporation is at any time to subject itself is $200,000.00 and the following certificate to the charter was offered:

"Territory of Arizona, Office of Territorial Auditor.

"United States of America, Territory of Arizona—ss.:

I, G. A. Mauk, territorial auditor of Arizona, do hereby certify the inclosed is a true and complete transcript of the Articles of Incorporation of the Commonwealth Bonding & Casualty Insurance Company and were filed in this office on the 29th day of March, A. D., 1911, at 3:45 o'clock p. m., as provided by law.

"In testimony whereof I have hereunto set my hand and affixed my official seal. Done at the city of Phœnix, the capital, this the 15th day of October, A. D., 1911.

"G. A. Mauk, Territorial Auditor."

Appellant introduced in evidence sections 767, 788, 789, and 797 of the Revised Statutes of the state of Arizona, as follows:

"767. (Sec. 7.) Every corporation organized under the provisions of this title shall file a copy of its articles of incorporation, certified to by the county recorder of the county where said articles are recorded, in the office of the secretary of the territory and have the same recorded by him in a book kept for that purpose. Such articles of incorporation must specify the highest amount of indebtedness and liability, direct or contingent, to which the corporation is at any time to be subject, which must in no case exceed two-thirds of the amount of the capital stock."

"788. (Sec. 28.) If any insurance corporation is under liabilities for losses to an amount equal to its capital stock, and the president or directors, after knowing the same, make any new or further insurance, the estates of all who make such insurance or assent thereto are severally and jointly liable for the amount of any loss which takes place under such insurance.

"789. (Sec. 29.) No corporation shall be formed for the transaction of business in any kind of insurance except on live stock, without a subscribed capital equal to at least one hundred thousand dollars in United States gold coin, twenty-five per cent. whereof must be paid in previous to the issue of any policy, and the remainder by monthly or quarterly installments within twelve months from the day of filing the articles of incorporation. Nor shall any individual or person transact business as agent of any non-resident person or corporation, whether foreign or domestic, in any kind of insurance, except on live stock, unless such person or corporation possesses available cash assets, exclusive of stock notes, to the amount of at least one hundred thousand dollars in United States gold coin over and above all liabilities."

"Laws of Arizona.

"Article III.

"Mutual Life, Health and Accident Insurance Corporations.

"797. (Sec. 37.) Every corporation formed under the laws of this territory for the purpose of mutual insurance * * * to persons for life or any fixed period of time, or to purchase and sell annuities, must have a capital stock of not less than one hundred thousand dollars. It must not make any insurance upon any risk or transact any other business as a corporation until its capital stock is fully paid up in cash, nor until it has also obtained a fund, to be known as a 'guaranty fund,' of not less than two hundred and fifty thousand dollars, as hereinafter provided. If more than the requisite amount is subscribed, the stock must be distributed pro rata among the subscribers. Any subscription may be rejected by the board of directors or the committee thereof, either as to the whole or any part thereof, and must be, so far as rejected, without effect."

The appellant testified that McDonald represented to him that:

"When they got things on foot and got into business, their money was almost unlimited, and they would loan us $10 for every dollar we subscribed in stock. I had right-smart confidence in the fellow. I don't know that I explained to him in that way that the object of my going into the company was cheap money. I said this to him, I know, that I had been wanting to get some one to stand to my back for some while. I remember that remark. I meant that, and he understood it that I would like to have things in shape to get money any time I wanted it, or needed it, and he represented that I could do that if I would take stock in this concern. That was the substance so far as I know of all that was said * * * Yes, I guess I did rely upon what McDonald told me the company would do and could do. He made his story stick pretty straight through. I am not sure that he told me about any particular amount of money that they had on hand, but more than enough money than he thought was needed. He told me about others that he had, and he thought he might be a little bit late. My recollection is that he had stock subscribed to about $800,000, and that I had to be in a hurry."

In testifying about signing the proxy, the appellant stated:

"I expect the most likely way was I gave it to Mr. Branham on account of his being better acquainted. I saw him about that time at Ft. Worth, and I may have given him the proxy personally. I cannot say whether I did or not for certain. I cannot say as to that—I may have given it to him. I was with Mr. Branham a day or two. In all probability if I sent it by mail I sent it to him. If he had asked for it there, I would have given it to him."

He further testified:

"If I did give any one a proxy or authorize anybody to use my name with this company for which I subscribed stock might be chartered under the laws of Arizona, I do not remember it at all. The proxy Stuart showed me did, I think, authorize him to vote the thing as he saw proper in the matter of incorporating under the Arizona law; that is my recollection of it. I know I read it when Stuart showed it to me. I don't believe I would have signed this proxy if I had known it was to incorporate under the laws of some state except Texas."

He further states:

"I do not think I would have agreed to have been incorporated with a paid-up stock of $16,-000 or $17,000. Yes, I think McDonald said something to me about a surplus fund they were going to create, but if he ever gave me the figures in regard to the surplus, or anything of that kind, I do not know."

Appellant testified he was well acquainted with Mr. Branham, one of the parties named in the proxy, to whom he thinks he delivered the proxy, and that he knew him well and had confidence in his honor and integrity, and regarded him as an honest man, knowing him more than 25 years. The assistant secretary, F. L. Kennedy, testified that he had since August 7, 1911, been in charge of the accounting department, and also had charge of the company's assets, such as notes, etc.; that there were about $16,000 received in payment for the capital stock in said company on and prior to the 23d day of March, A. D. 1911; that there was paid in actual cash, for capital stock in said company, about $16,000 at that time; that the company did not receive any cash for the capital stock of its company prior to the 23d day of March, A. D. 1911, in actual cash as much as $25,000. About $75,000 in cash had been received to the present date in paying for the capital stock of said company. He testified that no actual cash had ever been loaned by the Commonwealth Bonding & Casualty Insurance Company, to its stockholders, but the notes taken in payment for stock have, at all times, been regarded as loans by this company, and so considered by the commissioner of insurance and banking of the state of Texas, as we understand it. The treasurer of the company testified:

"After the charter was obtained from the territory of Arizona, on the basis of the capital stock of $200,000, the authorities at Austin refused to give a permit to do business in Texas, unless the entire authorized capital of $300,-000 was paid. Our attorneys advised us that it would be right and legitimate for us to transfer from the surplus as much as was needed to make up the $300,000 capital, and this we did. The certificate of stock on a basis of $200,000 had already been issued, and up to the time I left the company the amount taken from the surplus, which was a little over $100,000 had never been issued and distributed. The reason why the stock was issued was because there was a difference of opinion as to the best disposition of it. The fact that it was a little over $100,-000 made it very difficult of distribution among the stockholders, and some of the directors, I among the number, thought it would be best to issue it to trustees and sell it to outside purchasers."

The appellant, in his petition, sought to cancel the note executed February 1, 1911, and deed of trust executed February 24, 1911. The judgment canceling the note recites that the deed of trust executed on the 24th day of February, A. D. 1911, which was recorded in volume 4, Deed of Trust Records, was to secure a note executed February 1, 1911, made by appellant to appellee, for the sum of $4,375.

The facts in this case show that Stuart, Harkrider & Co. were a partnership operating as the Commonwealth Organization Company, and that they solicited the subscriptions for stock from parties throughout the country; that some time previous to the incorporation of the appellee there were letter heads procured, representing that certain parties were presidents and certain parties directors and stockholders in the concern, but as a matter of fact no business of the corporation was transacted further than a short time before the organization certain of the subscribers to the stock took charge of the affairs to collect up the subscription or to secure the payment of the same, and in doing so were necessarily out some expense. Stuart, Harkrider & Co. were, according to some of the testimony, required to pay all the organization expenses, and such seems to be the terms of the contract of subscription, but a misunderstanding or disagreement between Stuart, Harkrider & Co. and the stockholders who took charge to organize the company after subscription resulted in the fact that the stockholders themselves proceeded to the organization of the company, electing their secretaries, treasurers, etc., and the letters written to the various stockholders were done by these parties under the informal organization of some of the stockholders.

[1] Appellant assigns error to the action of the court in overruling special exceptions to the petition of appellee, to the effect that the alleged agreement to postpone the case, originally brought by appellant in the district court of Hansford county, until the 19th day of April, 1912, and after the appearance day of said court, was not alleged to have been in writing or made in open court and entered of record. We think if the agreement was made by appellant's attorney to pass the case for trial to a day subsequent to appearance day, a judgment on appearance day, in violation of the agreement, would permit appellant to take advantage of his own agreement, and in law was a fraud upon appellee. Traveler's Ins. Co. v. Arant, 40 S. W. 853; Thompson v. Railway Co., 31 Tex. Civ. App.

583, 73 S. W. 29. It certainly appears from the allegation of the pleading that at the time the judgment was taken appellant, as well as his attorneys, knew that the agreement had been made to pass the case until the 19th of April, 1912, and that for that reason the appellees were not then in court to present their defense. The court having adjourned on that day, there was no opportunity offered appellee to file a motion to set aside the judgment at that term of the court. It is also alleged that an agreement was entered into to change the venue from Hansford county to Lipscomb county and reduced to writing, and signed by the attorney for appellant, and by the appellee, and that the same was forwarded to the clerk of the district court of Hansford county, but was received after the court adjourned. We cannot set out all the allegations in the petition on this point, but believe under the facts as alleged it would be inequitable to permit the judgment to stand if the appellee otherwise alleged a meritorious defense, even though the rule did not require the trial court to enforce the agreement, if not in writing or made in open court. If, by reason of a verbal agreement thus made, appellee was deprived of the right to present its defense through the wrong or fault of appellant, a court of equity should, we think, set aside the judgment if the other necessary facts are alleged. We also think the facts sufficient in this case to support the judgment of the trial court in finding that appellee did not present its defense because of the fault of appellant and his attorneys, and that appellee was not negligent in the matter, and had the right, under the circumstances, to rely upon the promise and agreement of the attorneys to pass the case until the 19th and to rely upon the agreement to change the venue to Lipscomb county, without prejudice to its ·plea of personal privilege to be sued in Tarrant county, in case a settlement of the case was not reached or the case compromised. Appellee's assignments 1, 2, 4, and 5 are overruled.

[2] The facts are sufficient to support the judgment of the court and the findings that appellant was not induced to subscribe for the shares in the proposed corporation by representations that it would loan to him $50,000 as a stockholder, or that the purpose of its organization was to make such loans. It appears from the evidence the proposition made by the promoters was that the company would underwrite real estate loans equal to 50 per cent. of the real estate value, which were to be approved by the finance committee, at a cost of 1 per cent. to the stockholder. There is no evidence that appellant ever requested the company to so underwrite real estate notes, or that it had ever refused to do so for him.

[3, 4] Appellant, by signing the subscription contract, proposed to become a stockholder in the corporation to be formed under the laws of the state of Texas, with a paid-up capital stock of $200,000. Before participating in the organization, or if he did not waive such proposition, or by acts or by his conduct estop himself, he could avoid his liability on the subscription contract. It is doubtless true that by a failure to form the prospective corporation according to the terms of his subscription contract he would be entitled to recover back the money paid and cancel his subscription. The trial court, however, must have found that appellant waived the above provisions and remained a stockholder in the corporation, and was thereby estopped from canceling his subscription. The evidence in this case shows that the appellant was notified of the stockholder's meeting at Ft. Worth, held for the purpose of determining under what state law they should incorporate. He appointed as his representative a man whom he had known for 25 years to act for him in the meeting. He thereafter accepted, the evidence indicates, an agreement by the new corporation as chartered under the laws of Arizona, to underwrite any real estate loan he might make at 1 per cent. on the amount. If his subscription contract should be treated as a conditional one, we think the conditions could be waived by him. Cook on Corporations, § 88 (6th Ed.). If the appellant subscribed with the understanding that there should be actually paid in $200,000 by the stockholders before the charter could be obtained, this provision could also be waived. Cook on Corporations §§ 181, 188; Kampmann v. Tarver, 29 S. W. 1144; Olcott v. I. & G. N. Ry. Co., 28 S. W. 728, 10 Cyc. 399f. The appellant in this case having, through his agent, consented to incorporate under the laws of Arizona, with a less paid-up capital than he formerly agreed · the corporation could be incorporated for, should not, it occurs to us, be permitted to recover from his associates, with whom he acted in forming the corporation, the money he paid therein, and also cancel his obligation to pay his stock subscription. This would take from the corporation the funds and obligations upon the faith of which third parties have dealt with the corporation. ` It occurs to us that sound public policy ought not to permit one to participate in the organization of a corporation and then, after its organization, seek to withdraw the money he has placed in it because of the failure of the company to organize in the manner stipulated by some past agreement.

[5] Appellant attacks the act of incorporating. Under the evidence in this case the corporation is a de facto corporation. We do not think the corporation can be attacked collaterally by a stockholder upon call for payment of stock subscriptions. A stockholder who subscribes for stock is not only estopped from setting up irregularities in the formation of a corporation, but he is also bound by the rule that the existence of

a corporation cannot be inquired into except by direct proceedings in behalf of the state. Cook on Corporations, §§ 183 to 186.

[6] It is also asserted that the note and deed of trust is void because given in payment of stock. The facts in this case do not warrant that conclusion. The contract of subscription was given before organization, and the note and deed of trust were also executed before its organization. Upon call appellant was liable for his stock subscription. His note and deed of trust were a part of the subscription and to secure its payment upon the call. The fact that other subscribers were required to secure their stock subscriptions evidenced the fact that the subscription was made in good faith. The fact that appellant gave his note to evidence his indebtedness created by such subscription and executed a deed of trust to secure it, we do not think, should relieve him from his obligation upon call. We are of the opinion that the evidence is sufficient to support the judgment of the court.

The judgment is therefore affirmed.

### Supplemental Opinion.

The attorneys in this case request us as a matter of justice to the attorney who took judgment in cause No. 112, mentioned in the original opinion, to find that he had only consented to postpone the case and did not agree to continue it. We simply find that it appears from the record that after Mr. Stephens talked with Mr. Dalton over the phone, he, Stephens, wired the appellee company, April 12, 1912, the following: "What is your offer to compromise in the Medlin case? If you want to settle it I will pass it but will not continue." This wire appellee company did not answer but relied alone upon the agreement with Dalton. The facts, we think, warranted the trial court in finding to the effect stated by us in our findings in support of the judgment.