## CATTLEMEN'S TRUST CO. OF FT. WORTH et al. v. PRUETT.*
(No. 539.)

(Court of Civil Appeals of Texas. El Paso. March 9, 1916. Rehearing Denied April 6, 1916.)

1. CORPORATIONS ⬦80(10)—SUBSCRIPTION TO STOCK—FRAUD—WAIVER—RENEWAL OF NOTE FOR PRICE.

Where a subscriber to corporate stock, induced thereto by misrepresentations as to its par value, after discovering the truth of the matter, renewed the note given for the price of the stock, he waived the fraud and acquiesced therein, and could not have cancellation of the note.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 262; Dec. Dig. ⬦80(10).]

2. CORPORATIONS ⬦80(10)—SUBSCRIPTION TO STOCK — FRAUD — WAIVER — KNOWLEDGE —SUFFICIENCY OF EVIDENCE.

In an action by a subscriber to corporate stock, induced thereto by misrepresentations as to its par value, to cancel the note he gave for the price, evidence *held* to show that plaintiff, when he renewed the original note, not only had sufficient knowledge that the par value of the stock had been misrepresented, but had consulted with his attorneys, and told them the facts of the transaction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 262; Dec. Dig. ⬦80(10).]

3. CORPORATIONS ⬦80(12)—SUBSCRIPTION TO STOCK — MISREPRESENTATIONS — QUESTION FOR JURY.

In such suit, whether the party who negotiated the subscription contract with plaintiff represented that he was offering the stock at par value, and that such value was $20 a share, *held* for the jury under the evidence.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 264; Dec. Dig. ⬦80(12).]

4. TRIAL ⬦213—REFUSAL TO INSTRUCT—UNCONTRADICTED EVIDENCE.

Where evidence on an issue was uncontradicted, so that the matter was purely a question of law, the action of the court, after stating and finding the facts on the issue and making conclusions of law in favor of defendant, in refusing to instruct on the issue as requested by defendant, was not erroneous.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 480; Dec. Dig. ⬦213.]

5. CORPORATIONS ⬦99(1) — ISSUANCE OF STOCK FOR NOTE—STATUTE—"ISSUE."

Where a bank took a note for a subscription to its stock, which it issued in the subscriber's name, but retained possession until the note should be paid, apportioning dividends to the subscriber from the earnings of the company from the date of making the certificate, and recognizing the subscriber's proxy to vote the stock as valid, also sending him notices addressed to him as a stockholder, there was no violation of Const. art. 12, § 6, or Rev. St. 1911, art. 1146, providing that no corporation shall issue stock or bonds except for money paid, labor done, or property actually received; the stock not having been "issued."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 444; Dec. Dig. ⬦99(1).

For other definitions, see Words and Phrases, First and Second Series, Issue.]

Appeal from District Court, Presidio County; W. C. Douglas, Judge.

Suit by C. E. Pruett against the Cattlemen's Trust Company of Ft. Worth and another. From a judgment for plaintiff, defendants appeal. Case reversed, and judgment rendered for the named defendant.

A. H. Kirby and A. L. Camp, both of Ft. Worth, for appellants. Belcher & Sutton, of Marfa, and Lea, McGrady & Thomason, of El Paso, for appellee.

WALTHALL, J. This suit was filed by C. E. Pruett, in the district court of Presidio county, Tex., against the Cattlemen's Trust Company of Ft. Worth, and the Texas Underwriters Company, on the 21st day of December, 1914. Plaintiff, in his petition, sought the cancellation of one note for $3,-750, dated August 2, 1913, payable to the Cattlemen's Trust Company, which note plaintiff alleged had been renewed on August 2, 1914, on date of maturity, and extended to December 1, 1914. He also sought a cancellation of a note for $1,250, executed by plaintiff, payable to the Texas Underwriters Company, due August 2, 1914, which note was also renewed on August 2, 1914, and date of payment extended to the 1st day of December, 1914.

Plaintiff alleged that at the time of the execution of the two notes, he subscribed for 250 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth; that said stock was evidenced by certificate No. 220, attached to the renewal note for $3,750, as collateral security therefor. Plaintiff further alleged that said notes were given in full payment of the 250 shares of the capital stock of the Cattlemen's Trust Company; that the stock was issued to the plaintiff and was the sole consideration for the said notes, by reason of which plaintiff alleged that the consideration for said notes and each of them was illegal, and that all of said acts were ultra vires and contrary to article 12, § 6, of the Constitution of the state of Texas and the statutes thereof, and that defendants, by reason thereof, had perpetrated a fraud upon the plaintiff in Presidio county, where said notes and their renewals were executed. Plaintiff further alleged that J. B. Martin,

---

who acted as fiscal agent in taking his subscription for said stock for the purpose of selling him the said stock, represented to him that he was then offering the stock for sale at par value, to wit, $20 per share, and that said statements were false and fraudulent, in that the said stock represented a par value of only $10 per share, but that said statements were known to be entirely fraudulent by defendants; that said statements were material; that plaintiff relied wholly upon the said statements, and relied and acted thereon entirely in the several obligations alleged by him. Plaintiff offered to surrender 250 shares of stock for a cancellation of the said two notes, and prayed for an injunction, restraining the defendant from transferring or otherwise disposing of the said notes.

Each of the defendants filed its respective pleas of privilege to be sued in Tarrant county, Tex., both of which pleas were submitted to the jury on the trial of the case. Plaintiff filed reply to each of said pleas of privilege. On August 18th, defendants filed their original answer, consisting of a general denial of the allegations of the petition and specially answered as follows:

First. Defendants denied that any stock in defendant the Cattlemen's Trust Company of Ft. Worth has ever been issued to plaintiff, but say that while a certificate of 250 shares of such stock was written up in the name of plaintiff, same was never signed officially by the president or vice president, and said certificate was so written up only for convenience, and to avoid keeping an account with plaintiff on the books of defendant trust company, and that such certificate of stock is now, and has at all times been, in the exclusive possession and control of defendant trust company, and neither such certificate of stock, nor any other certificate of stock in said company, by reason of plaintiff's said subscription has ever been delivered to or given into the possession, control, or custody of plaintiff.

Second. Defendants alleged that the notes executed by plaintiff were given in connection with his subscription for stock in the trust company and as a part of the same transaction, and were given to evidence the time when, and the terms upon which, plaintiff was to pay for said stock, and not in full payment therefor, as alleged, and were executed and delivered upon the express condition and agreement that said stock so subscribed for was not to be delivered to plaintiff until said stock had been fully paid for, in accordance with said agreement; and that defendant trust company was ready at any time to deliver said stock to plaintiff upon his payment of the notes executed by him, by reason of which defendants denied that the consideration for said notes was or is illegal, or that there was any fraud perpetrated on plaintiff.

Third. Defendants denied all of the allegations as to the representations alleged by plaintiff as to the par value of the stock, and alleged that plaintiff knew, at the time he subscribed for the stock, that the par value of the same was $10 per share.

Fourth. Defendants further alleged that, after having acquired full knowledge that the par value of the stock in the trust company was not $20, as plaintiff alleged same was represented to him at the time he subscribed for same, plaintiffs and defendants, on or about August 2, 1914, made an agreement, whereby the notes originally executed and delivered to defendant trust company, for $3,750, due August 2, 1914, should be renewed, and plaintiff executed in renewal thereof his note for a like amount, due December 1, 1914, and that plaintiff transferred and assigned to defendant underwriters company, all dividends accrued or to accrue December 1, 1914, on the stock subscribed for by plaintiff in defendant trust company, and that defendant trust company, as a party to said agreement and contract, did agree to extend, and did extend, the time of payment of plaintiff's said note, by reason of which plaintiff ratified his said subscription contract and the notes given by him in connection therewith, waiving any fraud or invalidity of said contract, and is now estopped to seek to avail himself of the alleged representations as to the par value of said stock.

Plaintiff, by supplemental petition, denied all the allegations contained in the original answer, and further alleged that the notes were given in full payment for the 250 shares of stock; that it was understood and agreed, and the intention of the parties was that said stock should become the property of the plaintiff, if his subscription contract was not rejected within 20 days as provided, which was not done, but said stock was issued as evidenced by the said certificate No. 220, and that the same was placed with and pinned to his said notes as collateral security; that defendant trust company, its officers, agents, and representatives, have constantly treated and recognized plaintiff as a stockholder and owner of the said 250 shares of stock—they sent him notices of stockholders' meetings, paid him dividends on said stock, and voted the same at stockholders' meetings, etc.— whereby plaintiff alleged that the defendants are estopped to claim that he is not the owner of said stock and stockholder in the company, and that said stock has been issued.

Plaintiff further alleged that if he is mistaken as to the issuance of the stock, then in that event the contract of subscription between him and defendants was unilateral and without mutual covenant, conditions, agreements, and options.

After the evidence on behalf of the plaintiffs in chief had been introduced and plaintiff rested, the defendants presented their motion for an instructed verdict in their favor,

which the court heard and overruled, and defendants excepted. The evidence having been heard, the court submitted the case to the jury on special issues, and on the answers of the jury thereto the court rendered judgment in favor of the plaintiff, canceling the notes described in the petition.

Defendants requested four special peremptory charges; the first having reference to defendant's pleas of privilege, the second, to the issue of false representations, the third, to the issue of the validity of the notes on account of the provision of the Constitution, and the fourth, a general peremptory charge, which special charges were refused by the court. Defendants filed exceptions to the main charge of the court, and, same being overruled, defendants excepted and preserved same in bills of exceptions. Defendants filed motion for new trial, which the court heard and overruled. Defendants requested findings of fact and conclusions of law by the court on the issues raised by the pleadings as to whether the stock issued by the Cattlemen's Trust Company was in violation of the Constitution and laws of Texas. The court filed findings of fact and conclusions of law, and under the findings concluded that the certificate of stock issued was not in contravention of the Constitution and statute. The court submitted to the jury two issues: First, did J. B. Martin, in negotiating for the stock subscription contract with plaintiff, represent to plaintiff that he was offering said stock for sale at its par value, and that such par value was $20 per share; and, second, did plaintiff know, on or before August 8, 1914 (the date on which he agreed with defendants upon an extension of his notes to December 1, 1914), that the par value of the stock of the Cattlemen's Trust Company of Ft. Worth was less than $20 per share? To the first question the jury answered, "Yes," and the second question the jury answered, "No."

The appellants, by fourth special charge, requested a general peremptory instruction in their favor, and the refusal to give the charge is made the ground for appellant's first assignment. The proposition under the first assignment is made that where an action for the cancellation of a note is based upon alleged false representations and the evidence is uncontradicted that after the discovery of the falsity of said representations and with full knowledge of the same, the maker of the note renews said note, he thereby waives the alleged fraud, and no judgment can be rendered based on such evidence, other than a judgment denying the cancellation of the note. The contention is based on the proposition that the evidence was undisputed that Pruett, with full knowledge that $20 was not the par value of the stock when sold to him, renewed the notes, and that in so doing he waived whatever there was of fraud in the representations as to par value before the renewal of the notes. Appellee, in his counter proposition, concedes that the law is as stated by appellant, and that there would be error in the court's refusal to give the requested special peremptory charge, but amplifies appellant's proposition, and further contends that the law is that, if a party originally possesses the right to set aside a transaction on the ground of fraud to have the effect claimed by appellants, and to be a complete waiver of the fraud, Pruett must have obtained full knowledge of all the material facts involved in the transaction and become fully aware of its imperfection and of his own rights to impeach the transaction on account of the fraud, so that, when the renewal of the notes is made he can, and by the renewal of the notes does, give a perfectly free consent to such waiver of the fraud, and in doing so acts deliberately, with the intention of ratifying the voidable transaction the evidence so shows, then his confirmation is binding on him, and his right of action, by the renewal of the notes, is destroyed. To discuss this proposition, we must concede that as alleged, J. B. Martin, on the 2d day of August, 1913, for the purpose of selling the shares of stock to Pruett, wrongfully and fraudulently represented to Pruett that he was then offering said stock for sale at its par value, to wit, $20 per share; that Pruett relied upon the statements as true; that the par value of the shares of stock as represented was material, that is, that had Pruett known that the par value was less than $20, he would not have entered into the transaction; that at the time of the renewal of the two notes, on August 8, 1914, Pruett had not then acquired full knowledge that the par value of the stock subscribed for was not $20 per share, and if appellee's contention correctly states the law, Pruett, when he made the renewal notes, must have had full knowledge of his rights to impeach the former transaction, because of the representations as to the par value, so as to give free consent and sign the renewal notes with the intention to ratify the voidable notes. C. E. Pruett, appellee, on the point at issue under this assignment, testified:

"During the first time he (Martin) talked to me he didn't tell me the par value of the stock. He didn't tell me this until the last day he talked to me. He told me 15 or 20 minutes I guess before I closed the contract. I didn't know about the relative terms of par value or book value at that time. I didn't talk to anybody about the par value of the stock at that time or afterward. I first found out what the par value was something over a year after I subscribed. I found this out when the company sent me a contract to sign up, which was no part of the agreement I had with Martin. Therefore I refused to sign it. I don't know what kind of a contract you would call it, but I believe it was some time in 1914. It might have been later. Nobody told me the par value was not $20. The contract went ahead and stated the par value of the stock. I had not learned this from anybody else. When I was writing the company about my note the first time, I had no information at all about the par value of the stock. I did not know what I

had paid. I knew I was out $5,000 worth of notes. I had not talked to anybody at the time I wrote my first letter. I didn't know what the par value of the stock was at that time. When I said that I had paid one and a half for the stock, I didn't know at that time what the par value was. I didn't gain the idea that I had paid one and a half for the stock. I didn't consult anybody about this transaction prior to the time that I renewed my note. I didn't talk to anybody. I wrote my letters from the bank, I believe, but I am not sure. Previous to the time I signed up the renewal note, I didn't talk to anybody about the notes or the stock either. * * * I went ahead and wrote on my own initiative."

Being shown a letter dated July 24, 1914 (Exhibit G) introduced in evidence, the witness said:

"That is my signature, and I wrote that letter. It was written on Belcher & Sutton paper. It may have been written from there. When I went in there to write that letter, I don't remember who I saw, and don't know who I talked to in there about it. I don't remember talking to anybody about it. I don't think I talked to Mr. Sutton or Mr. Belcher at that time about this transaction. The first time I talked to them about it was just prior to the time I received that contract to sign up. I did talk to them about it at the time I signed up the renewal note and assigned the dividends. The paper you now show me, assigning dividends, is the contract that I refer to, and the signature is mine (Exhibit H). Before I signed this contract I didn't talk to anybody about it. I do not think I talked to Belcher & Sutton about it at that time—not anything about the stock. I didn't consult them as to whether I should renew the note and sign this agreement to transfer the dividends to the Texas Underwriters Company. I went ahead and signed. My intention was to carry out my contract, and the company laid down on me. When I wrote the letter of July 24th, I knew all the facts I mentioned therein to be true."

The letter of July 24, 1914, referred to, was read, which, among other matters, contained the following statement:

"I am not satisfied with this stock because it was misrepresented to me, in that I, according to the statements made, was not to pay a greater price than the par value of same, and in fact paid nearly one and a half."

Being asked what he meant when he said he had paid in fact nearly one and a half more than par, he testified as follows:

"He had heard it rumored around that he had paid more, and was trying to find out from the company what he did pay. I didn't know that I had paid more than par; I just put that in there to find out if I had. I had heard it rumored."

Being asked whom he talked with and who told him, he said:

"It was all over this country. Everybody that bought stock told me that the par value was only $10. I had heard it, and it was common talk here that the par value was only $10. Bertie Mitchell was one man who told me that. I think he had paid out his stock and gotten his certificate. I don't know who else told me. I believe Tom Crosson was one. Tom Crosson told me I had paid too much for it, I think. I don't think he told me that the par value was only $10. I think he just told me I had paid too much for the stock. * * * It is not a fact that when Mr. Martin was negotiating with me down there that he told me that the par value was $10, and that they were selling the stock at $20 per share and paying $10 to capital, $5 to surplus

and $5 for commission. If he had told me that, I would not have bought the stock. * * * I did remember the fact that I had paid one and one half for my stock when I wrote this letter on July 24, 1914. I knew at that time that I had in fact paid one and one half for my stock. I knew, also, that I had paid 25 per cent. for organization expenses on top of the one and one half, about that, the best I could figure it out. * * * I talked with my father about it right after I bought the stock. My father at that time had not paid out his stock and didn't have his certificate. * * * I did know at the time I wrote this letter that I had paid one and a half."

Being shown trust company letter of August 6, 1914 (Exhibit J) inclosing assignment of dividends on appellee's shares of stock, collateral agreement, and the renewal trust company note, for appellee's signature, appellee testified:

"After I received that letter with the note and the assignment I talked to Belcher & Sutton about the transaction. I signed them up. I think they wrote the letter sending the notes back. I showed them the letter from the company, and told them what my understanding was with Mr. Martin at the time I made the trade, and told them what I had heard about the stock and its value, gave them all the knowledge I knew about it, and after I had done that, Belcher & Sutton wrote the letter dated August 8, 1914. I think Mr. Sutton wrote it. Before he wrote this letter I went over the transaction with him, and then he wrote the letter and I signed up the renewal note and the assignment."

After going over in detail what Martin had said to him in reference to some matters referred to in the letter of August 6th, the appellee, among other things, said:

"Mr. Martin read me a lot of figures from a book as to what the company was doing. I intended to carry out my contract when I signed the renewal note, as soon as Mr. Martin carried out his, and I did this although I knew at that time that the par value was not $20; that is, I thought I knew at that time. I had heard it. I had heard it, and talked with my attorneys before I signed up that extension note."

On recross-examination, appellee said:

"The parties of whom I inquired about the value of the stock were the same parties named by me on cross-examination awhile ago. I talked with a great many of the stockholders here, and they all understood it alike. In other words, it was commonly understood here among the stockholders as to what the par value was, at that time, not before, and this was the time that I wrote the letter in which I said that I had paid one and a half."

Witnesses J. B. Martin and George W. Medley testified on the trial. Mr. Martin testified:

"I stated to Mr. Pruett the par value of the stock was $10. I stated it in black and white by figures, making figures to show that the stock was sold at $20, $10 went to capital stock, $5 to surplus and $5 to organization expenses."

George W. Medley said:

"I was present when Capt. Martin—at the time Mr. Pruett subscribed for stock in the Cattlemen's Trust Company, and suppose I heard what occurred at the time and what was said by the parties. At that time Capt. Martin stated to Mr. Pruett that the par value of the stock of the Cattlemen's Trust Company was $10 per share. Capt. Martin went into detail to explain the matter to him as to par value. He did this by writing it off in figures. As to par value, he

wrote $10 par value, $5 surplus value, $5 for organization expenses."

[1] The specific fact constituting the fraud charged is that J. B. Martin, for the purpose of selling appellee the certificate of stock, represented to him that $20, the price at which he was then offering the stock, was its par value, when in truth and in fact its par value was $10. Pruett gave his note for the stock, and at the maturity of the note renewed the note by taking up the original one and giving another, and the question to be determined here is: Does the uncontradicted proof show that when Pruett renewed the note he then had full knowledge that the par value of the stock was not $20 per share, as represented? Ratification and acquiescence are always questions of fact. There can be neither without knowledge. The terms impart this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant that it has been committed. Current suspicion and rumor are not enough. There must be knowledge of the facts which will enable a party to take effectual action. Nothing short of this will do, but he may not willfully shut his eyes to what he might readily and ought to have known. The renewal of the note, in order to constitute such waiver or acquiescence, must be done with full knowledge of all the facts; for Pruett, by the renewal of the note, cannot be held to have waived the fraud of which he was at the time wholly ignorant. Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420; Pomeroy on Contracts, § 279. The Fourth Court of Civil Appeals, in Wells v. Houston, 23 Tex. Civ. App. 629, 57 S. W. 584, stated the rule to be that if a party originally possessing the right of action to set aside a transaction on the ground of fraud has obtained full knowledge of all the material facts involved in the transaction, and has become fully aware of its imperfection, and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed, so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding and his right of action is destroyed. If, on the other hand, the original undue influence still remains, or if the act is simply a continuation of the former transaction, or if the party wrongly suppose that the original transaction is binding, or if he has not full knowledge of the material facts and of his own rights, no act of confirmation however formal, is effectual. 2 Pomeroy on Equity, § 964.

. It seems to us, from the authorities we have examined, that to say that Pruett waived his right to cancel the renewal note because of the representations as to the par value of the stock, he must have had knowledge of his right to cancel the original note at or before the time he made the renewal note. The knowledge of such right seems to be a prerequisite to its relinquishment. It could not be said that he waived that right unless he had knowledge of it, because, if he was ignorant of the right, an intention to waive cannot be implied. Wells v. Houston, 23 Tex. Civ. App. 629, 57 S. W. 584; Berman v. Fraternal Health, etc., 107 Me. 368, 78 Atl. 462; 2 Pom. Eq. § 964. Intention seems to lie at the very foundation of the doctrine of waiver. Nor is it sufficient that he should have notice of facts that, if followed up by inquiry, would have led to information that would have shown that he was discharged. State v. Churchill, 48 Ark. 426, 3 S. W. 352, 880; Thornton v. Wynn, 12 Wheat. 187, 6 L. Ed. 595.

[2] There is no doubt, however, but that, while an action for the cancellation of a contract based upon fraud in its procurement proceeds upon the theory of affirmance of the contract by the defrauded party, an important distinction exists with respect to acts done in affirmance of the contract after discovery of the fraud. The authorities are uniform in holding that if the defrauded party acquires full knowledge of the fraud and his rights in respect thereto while the contract remains executory, and thereafter does any act in affirmance of the contract, he thereby condones the fraud and waives his right of action. While the testimony of the appellee is confusing and contradictory in some of his statements, his evidence, quoted above, seems conclusive to us that appellee, not only had sufficient knowledge that the par value of the stock was not $20 at the time he renewed his note, but had consulted with his attorneys and told them all the facts of the transaction. We think it could hardly be said that he did not have full knowledge, both that the par value of the stock was not $20, and of his rights in the matter, so as to preclude the idea that he fully intended to consummate the transaction in the purchase of the stock when he renewed his note. In G., H. & S. A. Ry. Co. v. Faber, 77 Tex. 153, 8 S. W. 64, in which it was assigned as error that the court refused to instruct the verdict, the Supreme Court held that where the case was not made out, the jury should have been instructed. In the same case, the Supreme Court quoted with approval from Tooney v. Railway Co., 3 C. B. (N. S.) 146, the following:

"A scintilla of evidence or a mere surmise that there may have been negligence on the part of the defendant clearly would not justify the judge in leaving the case to the jury; there must be evidence upon which they might reasonably and properly conclude that there was negligence."

[3] The Supreme Court further said that the rule stated in that case is sustained by the weight of authority. The case was reversed because of error in not charging the jury to find for defendant. But should it be held that there are some intimations in

the evidence of appellee that at the time of the giving of the renewal note he did not have full knowledge that par value of the stock was not $20, or was not fully advised of his right to cancel the original note, because of the alleged fraudulent representations, and therefore no intention to condone the fraud was involved in the renewal of his note, and that the issue should be submitted to the jury, the evidence fully concludes that issue. Appellants, in their third, fourth, fifth, sixth, and ninth assignments, question the sufficiency of the evidence to sustain the finding of the jury on the second issue, that at the time of the execution of the renewal note, appellee did not then know that the par value of the stock was less than $20 per share, and question the sufficiency of the evidence to sustain the judgment, based on that finding. What we have said in commenting on sufficiency of the evidence under the first assignment applies to these assignments. The evidence, in our opinion, is insufficient to sustain the finding of the jury and the assignments must be sustained. We think the evidence was sufficient to justify the court in submitting the issue to the jury on the question of false representations as to the par value of the stock as submitted in the first issue; and the second, seventh, and eighth assignments are overruled.

At appellant's request, the trial court made and filed a finding of fact and conclusion of law on the issue as to whether, under the undisputed evidence, the stock had been issued by the trust company. The court found that a certificate evidencing that C. E. Pruett owned 250 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth of the par value of $10 each was filled out in the office of the trust company about August 14, 1913, that said certificate was not signed by the president or vice president of the company, but that the certificate in that condition was retained in the office of the company with the understanding that the same would be delivered to Pruett upon the payment of his note to the company, and held by the company in payment for said shares of stock according to a contract of subscription therefor. Dividends were apportioned to Pruett out of the earnings of the company from the date of the making of said certificate. Pruett sent in a proxy for the shares of stock, and said stock was voted under said proxy at the stockholders' meeting held September 8, 1913. Several notices were received by Pruett from said company addressed, "To our stockholders," and, "To the stockholders." Under this finding the trial court concluded and so held that the certificate for 250 shares of stock was not issued in contemplation of the provisions of article 1146 of the Revised Statutes or of article 12, § 6 of the Constitution, providing that no corporation shall issue stock or bonds except for money paid, labor done, or property actually received.

[4] The trial court refused to give appellant's special charge to the jury, directing a finding in their favor on the issue as to the validity of the notes on account of the above constitutional provision; and the court refused to give appellee's special charge, requesting a peremptory finding in his favor on said issue. The action of the court in refusing these special charges is made the grounds for appellant's tenth assignment and of appellee's first cross-assignment of error. The evidence on the issue being uncontradicted, and it being purely a question of law, and the court having fully stated and found the facts on the issue, and his conclusion of law being in appellant's favor, we fail to see any error in not instructing the jury on the issue as requested by appellant. We think the court might, without error, have adopted either method of disposing of the issue. The assignment is overruled.

[5] The question presented by appellee in his cross-assignment has recently been very fully considered and passed upon by the Ft. Worth Court of Appeals, and we think correctly so, in the case of the Cattlemen's Trust Company of Ft. Worth v. Turner, 182 S. W. 438, not yet officially published. In that case the facts are the same as in this, and we think we need not restate them here. In that case the court holds that the transaction had between the trust company and Turner does not contravene the provisions in our Constitution and laws.

The view we take of appellee's first cross-assignment and appellant's tenth assignment necessarily disposes of the other cross-assignments.

For reasons stated, the case is reversed, and here rendered for appellant.