CATTLEMEN'S TRUST CO. OF FT. WORTH et al. v. SWEARINGEN et ux. (No. 1268.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 16, 1918. Rehearing Denied Jan. 30, 1918. Dissenting Opinion, Feb. 7, 1918.)

1. CORPORATIONS ⬤99(1)—ISSUANCE OF STOCK —CONSIDERATION.

Evidence *held* to sustain a finding that there was a sale and delivery of stock in exchange for notes in violation of Const. art. 12, § 6, relating to issuance of corporate stock, although there was no manual delivery, and the certificate of stock was not made out for a year.

2. CORPORATIONS ⬤99(1)—SALES OF STOCK— VOID CONTRACT—PRESUMPTION.

An agent selling stock for a corporation having entered into a void contract to accept notes for stock in violation of Const. art. 12, § 6, it will be presumed that the parties acted thereafter in accordance with its terms.

Huff, C. J., dissenting.

Appeal from District Court, Hall County; J. A. Nabers, Judge.

Suit by H. S. Swearingen and wife against the Cattlemen's Trust Company of Ft. Worth and A. L. Camp to cancel a note and a deed of trust. Judgment for plaintiffs, and defendants appeal. Affirmed.

A. H. Kirby, of Ft. Worth, for appellants. Presler, Thorne & Hamilton, of Memphis, and Kimbrough, Underwood & Jackson, of Amarillo, for appellees.

HALL, J. Appellee Swearingen, joined by his wife, sued appellant trust company to cancel a note in the sum of $9,200.10, dated August 1, 1914, payable to said trust company, and to cancel a certain deed of trust conveying certain lands described in the petition to A. L. Camp, trustee, executed to secure the note. Camp, as trustee, was made a party defendant. It is alleged that the note had attached to it as collateral security a certificate for 500 shares of the capital stock of said trust company; that said note was the last successive renewal of an original note executed by the said Swearingen, May 13, 1913, payable to said trust company, in the sum of $7,500, due November 1, 1913; that said original note, together with another note not here involved, were executed in full payment for 500 shares of the capital stock of defendant company, and that said stock constituted the sole and only consideration therefor; that at the time of the execution of said two original notes plaintiff subscribed for 500 shares of the capital stock of said the Cattlemen's Trust Company of Ft. Worth; that said stock, when issued, was evidenced by certificate No. 185, attached to the renewal note, for $9,200.10, as collateral security; that said notes were given in full payment of the sum due for said 500 shares of capital stock; that the stock was issued to the plaintiff H. S. Swearingen, and was the sole and only consideration for said notes and each of them, and that no other thing of any value was given in consideration for said stock, by reason of which plaintiffs allege that the consideration for said notes and each of them, and the deed of trust, is illegal and void, ultra vires, and contrary to the Constitution and statutes of the state of Texas. The prayer is for an injunction restraining defendants from transferring said note or attempting to enforce collection thereof, and that on final hearing said note and deed of trust be canceled. A temporary injunction was granted. In due time defendants filed their original answer, consisting of a general denial, and specially answered, alleging in substance that neither of the notes described by plaintiffs was executed or delivered as part of an illegal and void contract and transaction, as alleged by plaintiff, but that plaintiff H. S. Swearingen did subscribe in writing for 500 shares of the capital stock of defendant company at and for the sum of $10,000, which sum plaintiff H. S. Swearingen promised and obligated himself to pay to defendant company; that to evidence the time when $7,500 of the said sum of $10,000 so contracted to be paid by plaintiff H. S. Swearingen should be paid, and as part of the same transaction in and by which plaintiff subscribed for said stock, said plaintiff executed and delivered to defendant company the note for $7,500 described in plaintiff's petition; that the other notes

described in plaintiff's petition were executed and delivered as successive renewals of said original note for $7,500, and said deed of trust was executed to secure said note for $9,200.10; that it was contemplated, understood, and agreed by the parties to said contract that said stock should be paid for at the time stated in said $7,500 note, and that said stock should be issued and delivered to plaintiff, and should pass from the control and custody of defendant company and become the property of said plaintiff when same had been fully paid for in cash, and then only should be issued, and in pursuance of said contract neither said stock nor any part of same has ever been issued or delivered to said plaintiff, or to any one for him and has never at any time been in the possession, control, or custody of plaintiff, or any other person than defendant company, but has been at all times since the contract of subscription was made, and still is, in the exclusive custody, control, possession, and keeping of defendant company; that while the certificate for said stock was written up in the name of plaintiff same was done merely for convenience, and not with any purpose or intention on the part of defendant company to issue same or deliver it, or in any manner place same beyond the exclusive control, custody, or keeping of defendant company until same has been fully paid for in cash, and in keeping with said purpose and intention said stock has never been issued, but is still in the exclusive custody, control, and keeping of the defendant company, and upon payment for same by plaintiff the defendant is ready and willing to issue said stock to plaintiff in accordance with the said contract; that plaintiff promised to pay for said stock at the time specified in said notes, and such promise was made in consideration of a promise of defendant company to issue to said plaintiff the stock subscribed for by him when paid for in accordance with said contract, by reason of all of which defendants say that the note and deed of trust described in plaintiff's said petition are not void, but are valid. There was a trial before the court without a jury, resulting in a judgment in favor of plaintiffs, resulting in a judgment in favor of plaintiffs, canceling the note and deed of trust.

The court filed findings of fact as follows:

"(1) That on and after December 1, 1912, the defendant Cattlemen's Trust Company of Ft. Worth was a private corporation, incorporated and organized under the laws of the state of Texas.

"(2) That on or about May 13, 1913, said defendant's agent, Martin, induced the plaintiff H. S. Swearingen to subscribe for 500 shares of stock in said corporation. When solicited to make said subscription said plaintiff stated to said Martin that he did not have the money with which to buy said stock, whereupon said Martin told him that he was prepared to take his notes for the stock. From their negotiations said plaintiff understood that the stock would be held by the company as collateral security for the payment of the notes, and that the certificate

of stock would not be turned over to him until the notes were paid.

"(3) Pursuant to said negotiations said plaintiff H. S. Swearingen on said date signed a written subscription of stock, certifying that he thereby subscribed for 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, for which he agreed to pay $10,000. Said subscription paper further provided that said corporation reserved the right to reject the subscription within twenty days from the receipt thereof, and also provided that 25 per cent. of the sale price of the stock was to be expended for organization and promotion expenses, to which said plaintiff agreed. Said subscription contract further stipulated that: 'I hereby make, constitute, and appoint A. L. Camp, of Ft. Worth, Tex., as my true and lawful attorney, to represent me and to vote my proxy.'

"(4) At the same time and as part of the same transaction, said plaintiff H. S. Swearingen executed his two promissory notes in favor of said corporation, both bearing date May 13, 1913, both bearing interest at the rate of 8 per cent. per annum from date, one being for the principal sum of $2,100, and the other for the principal sum of $7,500, both due November 1, 1913.

"(5) At the same time said Martin executed in the name of the Cattlemen's Trust Company of Ft. Worth, by himself as salesman, a receipt dated May 13, 1913, by which he acknowledged receipt from said plaintiff of the sum of $——, in cash, and $10,000 in notes 'in full payment for 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth,' which is to be attached to said notes as collateral, it is also recited that 'the above is paid in accordance with the subscription agreement,' etc.

"(6) I find that all of said instruments were contemporaneously executed and as parts of the same transaction; that the said subscription paper and the two notes were delivered by said plaintiff Swearingen to said Martin at the time they were executed, and the said receipt was delivered by said Martin to the said Swearingen at the same time; that the said Martin before maturity indorsed said $2,100 note and negotiated the same, and that said plaintiff paid it to a third person, holder thereof, at or about the time it became due; that said Martin delivered the $7,500 note, with the subscription to the defendant at its home office in Ft. Worth, within two or three days after receiving them from said plaintiff, and the defendant did not reject said subscription, but accepted the same, together with said note.

"(7) That about September, 1913, the said A. L. Camp, who was then president of the defendant corporation, in a meeting of the stockholders of said corporation, held at Ft. Worth, used and voted the 500 shares of stock in question on the proxy contained in said subscription, and that thereafter at later meetings said stock was voted by the other officers of said corporation upon proxy given by said plaintiff H. S. Swearingen. I also find that in December, 1913, said defendant corporation declared a dividend on said stock and placed the same as a credit on said plaintiff's subscription; that in December, 1914, said corporation declared another dividend on said stock and placed it as a credit on a note of said plaintiff, given in renewal of said original note above referred to, and that in December, 1916, said corporation declared another dividend on said stock, and placed the same as a credit on the note of said plaintiff, which he, by this suit, seeks to cancel and which is a renewal note coming from said original $7,500 note.

"(8) I further find that the defendant corporation listed said stock in its books, and wherever the same was so listed it stood in the name of plaintiff H. S. Swearingen; that it carried said 500 shares of stock as a liability on its books, and included them in statements made to stock-

holders and others among the company's liabilities for capital stock.

"(9) I also find that some time during the year 1914 a certificate of stock was written up, 'signed by the proper officers of the defendant company, torn from the certificate of stock book and attached to said $7,500 note, and since that time has been kept attached to said $7,500 note and the notes that have been given in renewal thereof, and that in this way said certificate of stock has been at all times in the actual, manual possession of said corporation, and never in the actual, manual possession of said plaintiff'; that said certificate of stock certifies that 'H. S. Swearingen is the owner of 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, fully paid and nonassessable,' and is indorsed, 'Issued to H. S. Swearingen May 13, 1913.' It is numbered 185, and bears the date May 13, 1913, bears the seal of the corporation, and is duly signed by the proper officers of the company. On the back of said certificate is the following indorsement: 'Certificate of 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, issued to H. S. Swearingen, dated May 13, 1913.' I find that said note of $7,500 was not paid at its maturity November 1, 1913, but on or about said date a new note in renewal thereof was executed by said plaintiff in favor of said corporation, bearing date November 1, 1913, due May 1, 1914, for the principal sum of $7,987.42. This renewal note had attached to it, on the same sheet of paper, signed by said plaintiff, a further instrument containing the following stipulations: 'Having executed and delivered to the Cattlemen's Trust Company of Ft. Worth a promissory note dated in Ft. Worth, Tex., November 1, 1913, for the sum of $7,987.42, due May 1, 1914, payable to the order of said company, and for the purpose of securing said note and all other indebtedness to said company now existing or which may hereafter arise on which I now or may hereafter become liable as principal debtor or otherwise, do hereby pledge, transfer, and deliver to said company the following securities, to wit: Five hundred shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, Tex., evidenced by certificate No. 185, hereto attached. * * * Default in the payment of any indebtedness hereby secured * * * shall at the option of the said company at once mature all indebtedness' secured thereby, and upon such default said company is authorized and empowered with or without notice to me or the public, to sell at private or public sale the whole or any part of the aforesaid securities, and deliver the same to the purchaser or purchasers thereof. * * * The proceeds of such sale shall be applied first to the payment in part or in whole of any indebtedness hereby secured. * * * Any surplus left shall be paid to me or my order.' And I find that it was the intention of the party to merge said subscription agreement and said original note into said renewal note.

"(10) I find that said renewal note was not paid at its maturity, but on or about April 22, 1914, prior to its maturity, said plaintiff executed and delivered another renewal note, dated April 22, 1914, due August 1, 1914, for the principal sum of $8,177.88, and otherwise containing substantially the same provisions as said first renewal note, and having attached thereto a collateral agreement, substantially the same as the collateral agreement attached to said first renewal note.

"(11) I further find that said renewal note was not paid at maturity, but that on or about August 1, 1914, said plaintiff executed a renewal note in lieu thereof, bearing date August 1, 1914, due November 1, 1915, for the principal sum of $9,200.10, and being otherwise in substantially the same terms as said first and second renewal notes, and that it had attached to it a collateral agreement in substantially the same terms as the collateral agreement to the said first renewal note, and said second renewal note, and I further find that this is the note which the plaintiffs seek to cancel by this suit. I further find that the plaintiffs have received no consideration for any of said notes except said defendant corporation's promise to issue and its issuance of said 500 shares of its capital stock.

"(12) I further find that the defendant corporation did not receive any benefit from said $2,100 note, but that it went to pay said agent Martin and those he represented for organization and promotion expenses, but said Martin's indorsement of said note, in the name of the defendant corporation, was O. K.'d by A. L. Camp, president of said corporation, and his right so to appropriate said $2,100 note is not disputed by any of the parties to this litigation.

"(13) I further find that said corporation has never received anything for said 500 shares of stock, except said $7,500 note, and the renewals thereof, which have resulted in the note now held by said defendant and produced in open court on the trial of this case by its counsel.

"(14) I further find that the plaintiffs, at the request of the defendant corporation, on or about the 3d day of December, 1914, to secure payment of said note of $9,200.10, executed and delivered to said defendant their deed of trust in favor of A. L. Camp, trustee, upon certain lands in Hall county, and in Collingsworth county, more particularly described in the copy of said deed of trust attached to plaintiff's petition. And I find that said deed of trust has been duly acknowledged, filed, and recorded in both Hall county and in Collingsworth county, and that it is a cloud upon the title of the plaintiff to said land.

"(15) I further find that it was the intention of the plaintiff H. S. Swearingen to buy said 500 shares of stock on a credit, and the intention of said corporation and its said agent Martin to sell said shares to the said plaintiff H. S. Swearingen on a credit at the time of the original transaction between said plaintiff and said Martin, and I further find that the further transactions between said corporation and the plaintiff have been had with the intention on the part of both parties to consummate and complete the sale of said 500 shares of stock in said corporation, evidenced by said certificate No. 185, to said plaintiff H. S. Swearingen on a credit, and that the consideration for the note and deed of trust which plaintiffs seek to cancel is the issuance and attempted issuance of said stock by said corporation to said plaintiff, and that as a result of the transactions between the parties said corporation has issued to the plaintiff H. S. Swearingen, and he has become the owner of said shares of stock so far as questions of fact are concerned, laying aside the question of the legality of these transactions."

The court concludes as a matter of law that there was an issuance and sale of the stock to plaintiff on credit, and that the defendant company treated plaintiff as the owner of the stock. The written evidence and physical facts show beyond question that the stock was duly issued, that the notes constituted the only consideration, that the title to the stock passed to appellees, and that there was a constructive delivery of it to him, all in compliance with the original agreement between Swearingen and Martin. It further appears from this evidence that the practical construction placed by the parties upon the contract accords with this conclusion. The subscription contract recites that Swearingen has subscribed for 500 shares of the capital

stock of the company, for which he agrees to pay $10,000, and that A. L. Camp is appointed the true and lawful attorney of the subscriber, and authorized to vote as his proxy. The notes executed at the same time by Swearingen, payable to appellant, must be taken to represent the cash consideration named in the subscription contract since the receipt executed by appellant's agent, Martin, on the same day recites that the company has received of Swearingen $10,000 in notes, in full payment for 500 shares of the capital stock of the company "which is attached to said notes as collateral." As a part of the same writing we find this recital:

"The above is paid in accordance with the subscription agreement of this date which the said subscriber has this day executed."

In accordance with the agreement that the stock should be held as collateral security the certificate was issued and attached to the notes. The renewal notes recite:

"Full authority is hereby given to the legal holder hereof to sell any collateral security assigned or attached at public or private sale, without notice, upon nonpayment."

Attached to the note is an agreement signed by Swearingen, which in part recites:

"Having executed and delivered to the Cattlemen's Trust Company of Ft. Worth, Ft. Worth, Tex., a promissory note, dated Ft. Worth, Tex., November 1, 1913, * * * for the purpose of securing said note and all other indebtedness to said company, now existing or which may hereafter arise, on which I now or may hereafter become liable as principal debtor, or otherwise, do hereby pledge, transfer, and deliver to said company the following securities, to wit, 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, evidenced by certificate No. 185, hereto attached; * * * in case the securities herein pledged or which may hereafter be pledged shall be or become depreciated in value on demand from said company or holder of said note, I agree to make payment on said indebtedness hereby secured, or deposit additional securities to the satisfaction of said company or holder. Default in payment of any indebtedness hereby secured, or failure to make payment or deposit additional security as above provided, shall, at the option of the said company, at once mature all indebtedness secured thereby, and upon said default said company is authorized or empowered, with or without notice to me or the public, to sell at public or private sale the whole or any part of aforesaid securities, and to deliver the same to the purchaser or purchasers thereof. At such sale the company may become the purchaser of the whole or any part of said securities, without any right to redemption on my part. The proceeds of such sale shall be applied, first, to payment in part or whole of any indebtedness hereby secured, said company to have option of application; any surplus left shall be paid to me or my order."

Letters received by Swearingen from A. L. Camp, the president of the company, inclosed resolutions by the directors, declaring several dividends, and notifying him that his note had been credited with the several dividends apportioned to his stock. The language of the certificate is:

"This certifies that H. S. Swearingen is the owner of 500 shares of the capital stock of the Cattlemen's Trust Company of Ft. Worth, fully paid and nonassessable," etc.

The term "collateral security" is said in 11 C. J. 961, to be:

"Any property or right of action; as a bill of sale or stock certificate which is given to secure the performance of a contract or discharge of an obligation and as additional to the obligation of that contract, and which, upon the performance of the latter, is to be surrendered or discharged. * * * The term necessarily implies the transfer to the creditor of an interest in some property or obligation which furnished a security in addition to the responsibility of the debtor. The collateral security stands by the side of the principal promise as an additional or cumulative means for securing the payment of the debt."

The probative force of the language quoted from the written evidence introduced is overwhelming. It shows that the parties fully and clearly intended that the sale of the shares should be not on credit, as found by the trial court, but in consideration of the notes, and that the notes were taken in lieu of cash, as provided in the subscription contract, in "full payment" for the stock. If Swearingen was not the owner of the stock, and the company still owned it, how could it be considered and held by the company as collateral security? Where the sale is on credit the stock may be forfeited by the company under Revised Statutes, art. 1170, in the event the purchaser makes default in the payment of any installment. Because the sale in this case was a completed one it was necessary to have Swearingen to authorize a sale upon his failure to pay the note. Securing the power of sale may be taken as an admission by the company that the statute was inapplicable because the title had passed to Swearingen. There being no installment payable, the sale must necessarily be under a power, given by Swearingen.

The certificate had been duly written up, detached from the stock book, and attached to the notes. Presumably, in accordance with the agreement between Martin and Swearingen, the note had been credited with the accrued dividends. Camp, as the president of the company, had furnished appellee periodical statements showing the condition of its finances, and in all matters Swearingen was treated as the absolute, rather than the conditional or qualified, owner of the stock. These acts show a practical interpretation of the contract, which is almost conclusive (Corbin v. Booker, 184 S. W. 696), and when considered with the documentary evidence, show a constructive delivery of the certificate to Swearingen (McCartney v. McCartney, 53 S. W. 388). Whether there was an issuance and delivery of the stock in consideration of the notes, as well as the question of ownership, presented under this record simple questions of fact. Henry v. Phillips, 105 Tex. 459, 151 S. W. 533; Towery v. Henderson, 60 Tex. 295.

The receipt given by Martin, appellant's agent, stating that the notes for $10,000 were received in full payment for the stock, is conclusive and is alone sufficient to support the

court's findings. These uncontroverted facts are wholly inconsistent with appellant's contention that the sale was never completed, and that the stock was never issued. It was shown by parol that after the certificate of stock was written up early in 1914, it was kept with the notes, and that no manual delivery of it was ever made to Swearingen.

Swearingen testified:

"The agreement between Mr. Martin and myself was at the time he took my subscription for the stock, that it was to be issued to me, and it was put up as collateral to the note, and I guess I would get the stock when I paid the note. Mr. Martin did not tell me at the time I subscribed for the stock that I would not get it until I paid the note in full. He told me that the stock would be issued, but it had to be put up as collateral until the note was paid. I have never gotten the stock; have never seen it. You ask me if I ever called for it. Well, I could not call for it until I paid the notes. I supposed that the Cattlemen's Trust Company would take care of the stock since they had no money. The reason I did not call for it was because I was not to get the stock until I paid the notes off. I suppose it was issued to me as that was the agreement. I have never seen the stock, and have never had it in my possession. I suppose the Cattlemen's Trust Company has had it all the time to secure my note. So far as I know nobody else has ever had it. You ask me if I understood at the time I made the subscription that I would not get the stock delivered to me until I got the notes. I hardly know how to answer that question. I supposed the stock was issued or I could borrow any money on it, but my notes would not have any collateral until the stock was issued. That's the only way I know how to answer the question. I knew that the stock would not be issued to me unless I had security up there for it. No, I was not borrowing any money from the Cattlemen's Trust Company. I did later on borrow some, and I put up additional security for it. The understanding I had with Mr. Martin when I gave him the subscription for the stock and signed the contract was that the stock was to be issued and held as collateral. I knew that I would not get the stock until I paid the notes. I thoroughly understood that; understand that I have never asked to see the stock, and have never demanded that it be delivered to me because I owed this money, and I could not expect to get the collateral without my note being paid. I think a man would be foolish to go to a bank and demand his security without paying his note. * * * As to the ownership of the stock and who it was to belong to I understood that this certificate would not be placed in my hand until I paid up the note. It was to be held as collateral, but the understanding between us at the time, that is Martin and myself, was that the stock was to be mine because he said that I would participate in dividends, and that anybody who bought during May, or before, would get the dividends. The company took this stock and attached it to my note for $7,500. Mr. Martin stated to me that I would get the dividends from the start, and he told me that at the time I signed the notes and subscription contract. I went along believing that I owed the note, and that I owned the stock, until about the time I brought this suit."

A. H. Kirby, attorney for the company, testified in part as follows:

"I desire further to make the statement that that certificate of stock in question has never been out of the possession of this company since it was written up, and that during all that time it has been in the actual possession, control, and custody of the Cattlemen's Trust Company, and is yet. I desire to say further that it was written up as a matter of convenience to avoid keeping books with the different stockers, and it was kept in an envelope along with the other papers that he would get when he paid for his stock. This certificate was not written up until some time in 1914."

J. B. Martin, the agent who secured the subscription, testified for the company. That part of his testimony bearing upon the issue under consideration is as follows:

"I told him [Swearingen] that he would get his stock when his note was paid; that on payment of the note the stock would be delivered to him. I did not tell Mr. Swearingen that the stock would be issued to him at once, * * * and as far as I know, the Cattlemen's Trust Company may have allowed subscribers to stock in the company dividends from the time they subscribed for the stock, but there was a special agreement in Mr. Swearingen's case. I told him he would receive dividends from the date of his note, and he objected to paying interest on this note, and that is the reason I took his other note for $2,100 (instead of for $2,500). I paid the interest myself. I wanted to be on the safe side, and I took his note in that way. That $2,100 note went to myself and the organization company. I told him he would get dividends from the date his note and application were accepted, and he objected to paying interest on the $7,500 note, and I cut down his $2,500 note to $2,100."

G. W. Medley, a witness for the defendant, testified with reference to this issue as follows:

'I took Mr. Swearingen in there [Welty's office in Clarendon] and introduced him to Martin. I would not be able to begin at that point and tell all I heard that passed between them. I heard them talking it over very carefully, and Martin explained that he was selling this Cattlemen's Trust Company stock, and he explained the way in which he was selling it. He said he was selling this Cattlemen's Trust Company stock at $20 per share, $10 for capital stock, $5 for surplus, and $5 for organization expenses, and he explained how he would sell him [Swearingen] the stock. That he would sell him the stock without— Swearingen said he did not have the cash to pay, and Martin said, 'I am prepared to take your note for the stock,' and they went on with the general details of the proposition as you have heard detailed here before. When Martin detailed the proposition as I have stated, that is, $10 for capital stock, $5 for surplus, and $5 for organization expenses, he said he would take one note for $7,500, and one for $2,500; that the stock would remain up as collateral until the notes were paid; then Swearingen accepted the proposition. I could not tell you the words he used in accepting it. He said, 'I haven't got the money to buy the stock.' He said after Martin's explanation that he would like to have the stock, but didn't have the money. Then when Martin told him he could buy it with notes, I don't know just what he said then. At any rate, he signed up the notes and the stock subscription."

The statement of facts shows that this witness was related to Martin by marriage, and that he was active in securing the subscription contract from Swearingen and subsequently was a soliciting agent for the company. We are unable to see anything in this oral testimony inconsistent with the idea that the sale was completed, and the title to the stock passed to Swearingen when his notes were accepted by the company in lieu of the cash, and the stock certificate

was filled out and attached to the notes as collateral security. The fact that the stock remained in the possession of the company and no manual delivery of the certificate was ever made to Swearingen is, in our opinion, of no force, since it was clearly understood that this disposition was to be made of the stock. Manual delivery is not always necessary to complete a sale. Simpkins, Cont. & Sales (3d Ed.) 869. The effect of the evidence is to show that in accordance with the contract the stock, after its issuance, was not to be actually delivered to Swearingen, but was to be held as a pledge; that it should be retained by the company as collateral security. It would, therefore, have been a violation of their agreement if the stock had been actually delivered to Swearingen. There is nothing inconsistent with Swearingen's absolute ownership in this part of the transaction. When the witness Kirby says that "the certificate has at all times been in the actual possession, control, and custody of the company," he simply asserts that the company has complied with its contract with Swearingen to keep it as collateral security. That portion of his testimony wherein he says that it was written up as a matter of convenience to avoid keeping books with the different stockholders tends to contradict the reasonable inference deducible from the testimony of every other witness, from the documentary evidence, and from the physical facts that such act was an issuance of the stock in compliance with the contract of sale, and the court seems to have considered it as a mere conclusion of the witness. The court seems not to have believed the evidence of the witness Martin when he denied telling Swearingen that the stock would be issued to him at once. There being no jury, the court was the judge of the credibility of the witnesses, and since nearly all of the testimony corroborates Swearingen's statement, we do not feel authorized to reverse the judgment on that account. The testimony of Medley is strongly corroborative of Swearingen's statement that he paid for the stock with his notes, and this, when considered with the language of the receipt given for the notes, and the practical construction placed upon the contract by the parties, leaves no room for doubt in our minds that the sale was one in violation of article 12, § 6, of the Constitution of this state.

The fact that it was agreed that Swearingen was not to have the manual possession of the stock until he paid his notes, and the further fact that the stock was to be retained as collateral security for the notes, are matters which, under some of the decisions, are not inconsistent with the theory advanced by either side of the case. The question of ownership, as said by the Supreme Court of the United States, in Hatch v. Standard Oil Co., 100 U. S. 124, 25 L. Ed. 554, "is rather one of intention than of strict law; the general rule being that the agreement is just what the parties intended to make it." The cases construing article 12, § 6, of the Constitution of this state may be divided into three general classes: One is where the original contract is valid, but has become invalid by the subsequent issue of stock in consideration for notes or other property not designated by the Constitution. Kanaman v. Gahagan, 185 S. W. 619, is an illustration of cases of this class. The second class comprises cases where the sale of the stock is made on credit, with the understanding that the stock is not to be issued until fully paid for. In San Antonio Irrigation Co. v. Deutschmann, 102 Tex. 201, 105 S. W. 486, 114 S. W. 1174, Judge Brown declared the Constitution did not inhibit sales on credit, and this holding has been followed by a number of cases, among which may be mentioned Medlin v. Commonwealth Bonding & Casualty Ins. Co., 180 S. W. 899; Commonwealth Bonding & Casualty Ins. Co. v. Hill, 184 S. W. 247; Horn Bros. v. Baker, 173 S. W. 475; Cope v. Pitzer, 166 S. W. 447; Farmers' & M. Bank v. Falvey, 175 S. W. 833; Davis v. Burns, 173 S. W. 476; Cattlemen's Trust Company v. Turner, 182 S. W. 438; Smoot v. Perkins, 195 S. W. 988; Cattlemen's Trust Company v. Pruett, 184 S. W. 716. Under the third class fall all cases where, by reason of the fact that it is contemplated by the agreement that notes or other property not specified in the Constitution shall be taken in payment for the stock, the contract is void ab initio. In this class may be mentioned Commonwealth Bonding & Casualty Insurance Co. v. Hollifield, 184 S. W. 777; Crawford v. Davis, 188 S. W. 436; Prudential Life Insurance Co. v. Smyer, 183 S. W. 825; Mitchell v. Porter, 194 S. W. 981; Mason v. First National Bank, 156 S. W. 366; Sturdevant v. Falvey, 176 S. W. 908; San Antonio Irrigation Co. v. Deutschmann, 102 Tex. 201, 105 S. W. 486, 114 S. W. 1174; McCarthy v. Texas Loan & Guaranty Co., 142 S. W. 96; Republic Trust Co. v. Taylor, 184 S. W. 772; O'Bear-Nester Glass Co. v. Antiexplo Co., 101 Tex. 431, 108 S. W. 967, 109 S. W. 931, 16 L. R. A. (N. S.) 520, 130 Am. St. Rep. 865.

[1, 2] The uncontradicted evidence in this case brings it fairly within the last class. Swearingen testified in effect that even before the subscription contract was signed the agreement he made with Martin was that the notes should be taken in lieu of cash; that the certificate of stock should be issued at once and held by the company as collateral security only. Medley corroborates Swearingen, and Martin's receipt concludes the matter. Although Martin was introduced as a witness by the company, he did not deny these facts. An illegal contract having been proven by uncontradicted evi-

dence, we must presume that the parties acted thereafter in accordance with its terms.

The judgment is sustained by the evidence, and is affirmed.

HUFF, C. J. (dissenting). I am unable to concur in the affirmance of this cause, and believe it not improper to express as briefly as I may my views. The Constitution prohibits the issuance of stock except for money paid or labor done. A contract to purchase stock to be paid for before the stock is issued is not, as I conceive it, illegal. Neither do I think it to be unlawful to treat one as a stockholder who has not paid for his stock. To constitute one as a stockholder some sort of subscription or contract is required whereby the subscriber obtains the right upon some condition to demand and exercise the right of a stockholder. R. C. L. vol. 7, Corporations, §§ 182 to 212.

I believe our statute recognizes a subscriber as a stockholder who has a contract for stock. By the statutes a corporation may receive a charter without having all its capital stock fully paid. Subscribers to capital stock may be required by the directors to pay their respective subscriptions in such manner and in such installments as may be required by the by-laws. If a creditor of a corporation cannot ·make his execution out of property belonging to the corporation, then execution may issue against "any stockholder to an extent equal to the amount unpaid." If the corporation is dissolved a stockholder is liable to the creditors thereof to the amount of his unpaid stock. If a stockholder shall neglect or fail to pay any installment as required, his stock may be declared forfeited upon statutory notice to the stockholder.

These several statutes clearly recognize as stockholders those who have not paid for their stock, and as such they should appear on the books of the corporation and be entitled to vote, receive dividends, and are entitled to all the privileges and immunities as such, as well as for its liabilities. It does not appear to have been the purpose of the Constitution or the laws to deprive a stockholder of the right to a voice in the affairs of the corporation because he has not paid his subscription. It is evident, I think, from the statutes, that a subscriber who has not paid for his stock has a qualified' ownership in the stock. I therefore conclude that the mere fact that the name of such stockholder appears upon the books of the corporation, that he voted his stock, or gave a proxy, and participated in the affairs of the corporation, received dividends, and was communicated with as a stockholder, should not have any evidentiary value in establishing that stock has been issued to him, or that there was a contract to issue to him stock which had not been paid for as required by law. Our Supreme Court recog-

nized as stockholders in a limited sense persons who have not paid for their stock. O'Bear, etc., v. Antiexplo Co., 101 Tex. 431, 108 S. W. 967, 109 S. W. 931, 16 L. R. A. (N. S.) 520, 130 Am. St. Rep. 865; Mathis v. Pridham, 1 Tex. Civ. App. 58, 20 S. W. 1015. It is contended in this case by appellees that because article 1168, R. C. S., provides that stock shall be deemed personal estate, and is transferable only on the books of the corporation, that no certificate is contemplated, and hence I presume it is contended when a stockholder stands on the books as a stockholder, there has been an issue within the meaning of the Constitution.

Our Supreme Court has determined this question adverse to appellee's contention. That court held the provision for the record of the transfer upon the books was intended for the benefit of the corporation, so that by ready reference it could determine who were the legal stockholders, who entitled to vote, receive dividends, etc., and to whom it could safely issue new stock. "Although the certificate was not shares of stock itself it was what the company constituted the visible representation of it, and as between the shareholders and his assignee the equitable, if not the legal, title to the stock would pass by a transfer of the certificate and this without being recorded on the books of the company." The transfer of the certificate is prima. facie evidence of the right of the holder. This construction of the legal effect of a certificate of stock is now required as a matter of necessity. As against the shareholder the transferee would, whether his transfer be recorded on the books or not, have a good title, and as against the company enable him to demand that he be recognized as a shareholder. Strange v. Railway Co., 53 Tex. 162; Baker v. Wasson, 53 Tex. 150; Rio Grande Cattle Co. v. Burns, 82 Tex. 50, 17 S. W. 1045 (2). A certificate of stock is generally recognized as a representation of property and as occupying much the same status as a chose of action. Thompson on Corporations, § 2348. "The issue of stock generally means the issue of the certificate. In most of the states and in the federal courts, trover lies for the conversion of stock." · Cook on Corporations, § 12.

It seems to me the issue of this "visible representation" 'of stock is the thing prohibited by the Constitution. The certificate represents the stock. Its issuance carries the title to the thing itself. This issue of stock, without money paid, is void, and ·no title or interest in the company's capital stock passes thereby under the laws and Constitution.

As I understand the opinion in this case, because the receipt provided the stock should be held as, collateral to the note, that such would establish a contract to "issue." Such an agreement required no more than the statute itself provided. The statute recognized that the corporation holds the stock

subject to be forfeited for nonpayment of the subscription. Article 1170. I do not think the remedy by the statute exclusive, but it is merely cumulative. R. C. L. vol. 7, Corporations, § 230. The parties could therefore lawfully agree the stock should secure the subscription, and the fact that the company so held the stock did not render the contract illegal. In the construction of a contract where it is susceptible of two constructions, one which would render it illegal and the other lawful, that construction which would conform it to law must be adopted, and that both parties are presumed to know the law and intended to obey it. Foard County v. Sandifer, 105 Tex. 420, 151 S. W. 523.

In this case appellee while he testifies it was agreed, when he subscribed that the stock should be "issued" to him, he yet repeatedly stated and admitted that the stock was not to be delivered to him until he paid for it, that he never saw the certificate, never had possession of it, and did not at any time demand it, because he had not paid for it, and understood he was not entitled to it until he paid for it. It was at all times in the possession and under the control of the company. In order to be issued in the sense of being sent forth there must have been a delivery. This is universally the rule as to notes, bonds, and the like. No liability was created until its delivery. The statement of Swearingen that there was to be no delivery, contradicts his conclusion that it was to be issued to him.

The collateral contract attached to the renewal notes is much the same as that in the case of Farmers' & Merchants' State Bank v. Falvey, 175 S. W. 833, and the testimony on delivery also has common features with this case. See, also, Cope v. Pitzer, 166 S. W. 447, and many other cases on the question of issue. There could have been, in my judgment, no constructive delivery when it was expressly agreed and understood there should be none until paid for, and when in accordance with that agreement it was never delivered.

There was no merger as the trial court held. The surrender of the old note does not show the debt was paid when evidenced by a renewal. The intention of the parties to discharge the debt must be shown on an express agreement of the parties to have the effect of extinguishment. A delivery or surrender of the old note upon its being renewed does not in itself raise a presumption of the extinguishment by the new. The creditor may elect to sue upon the original indebtedness or upon the new note. The right of action is only suspended upon the original consideration until the new note becomes due. Otto v. Halff, 89 Tex. 384, 34 S. W. 910, 59 Am. St. Rep. 56.

There was no extinguishment of the debt by accepting as collateral security or a contract evidencing collateral security. Graves v.

Allen, 66 Tex. 589, 2 S. W. 192. If the original debt was valid, the subsequent issuance of stock would not defeat that debt.

For the reasons above given, with others, I respectfully dissent.